**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE LOCK LOFT, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 1:20-cv-122 |
| v. | : | |
| | : | |
| ERIE INSURANCE EXCHANGE, | : | |
| | : | |
| Defendant. | : | |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION
TO DISMISS THE FIRST AMENDED COMPLAINT**

**PRELIMINARY STATEMENT**

On March 9, 2020, the Governor of Ohio declared a state of emergency and authorized

the Ohio Department of Health ("ODOH") to issue regulations addressing the Coronavirus

"public health threat."  Ten days later, on March 19, the ODOH closed certain business where

employees and consumers come into close quarters, like hair salons (Plaintiff operates a hair

salon) and tattoo parlors, among others.  Three days later, on March 22, the ODOH issued an

order requiring all Ohioans to stay at home except to utilize essential services, and identifying

which businesses were essential and could stay open (not hair salons).  As a result of these orders

("Executive Orders") trying to curb person-to-person transmission and relied upon by Plaintiff as

the basis of its claim, Plaintiff could no longer service its customers.

Plaintiff commenced this suit on May 26, 2020, alleging that it was entitled to business

interruption and related coverages under its policy with Erie Insurance Exchange ("Erie").

Plaintiff's theory was straightforward:  the Executive Orders shut down its business, triggering

coverage.  *See* Compl. (Dkt. No. 1) "Introduction" at p. 2; *see also id*. ¶¶ 51-56.  Erie moved to

dismiss the Complaint.  (Dkt. No. 14)  By then, three courts had ruled (including one in favor of

Erie) that there was no coverage because, among other reasons, coverage is triggered only where there is physical injury to property that causes a business interruption loss, and the policyholders' claimed losses, these courts noted, were caused *not* by any physical damage to its property, but by governmental orders (like the Ohio Executive Orders).

By the time Erie filed its reply brief (Dkt. No. 20), four more courts had dismissed business interruption lawsuits premised on COVID-19 governmental orders, for the same reasons. And, since then, as explained below, even more courts have dismissed COVID-19 business interruption claims against insurers. Given the avalanche of cases dismissing complaints just like Plaintiff's, Plaintiff filed a sur-reply brief (Dkt. No. 23-1) in which it acknowledged that under recent caselaw there is no coverage for economic losses caused by the Executive Orders. Plaintiff claimed, however, that the result should be different here because it supposedly alleged in its initial Complaint that its losses were caused not by the Executive Orders, but by the possibility there was some Coronavirus at its business. Plaintiff sought leave to amend, which Erie did not oppose. The First Amended Complaint ("FAC") was filed on September 16, 2020. (Dkt. No. 26-1)

The FAC does not—and cannot—cure the fundamental defects in Plaintiff's claim. While Plaintiff now pleads the threadbare conclusion that the Coronavirus may have been on its premises—an allegation based on pure speculation—Plaintiff *still* concedes that the Executive Orders are what caused Plaintiff to stop servicing clients. There is no way to plead around this immutable reality. Adding conclusory allegations that the Coronavirus may have been present at Plaintiff's business changes absolutely nothing.

Moreover, under Ohio law, which governs this case, any virus on the property would not be sufficient to trigger coverage, even putting aside that Plaintiff's alleged losses were, as it

concedes, caused by the Executive Orders. Under Ohio law—and the law elsewhere—microbial matter (like mold) that can be cleaned off surfaces does not cause physical loss or damage to property, which is a prerequisite to coverage. This is clear from the Executive Orders themselves, which allowed scores of businesses to remain open. If the Coronavirus was everywhere and caused property damage everywhere thus rendering all property unusable, then everything would have been closed. But that did not happen, because the Coronavirus harms people, not property, and the government implemented rules designed to impede the spread of the virus and not to address any purported property damage. For all these reasons, and as set forth below, Plaintiff's amendment does not save the claim and hence the FAC should be dismissed with prejudice.

## STATEMENT OF FACTS

Plaintiff is an Ohio limited liability company that operates a hair salon in Lakewood, Ohio. FAC ¶ 1. During the period of July 1, 2019, through July 1, 2020, Erie Insurance Exchange insured Plaintiff's premises (hereinafter "the Premises") under Ultrapack Plus Policy No. Q97-1838248 (hereinafter "the Policy"). *Id*. ¶ 8.

In March 2020, the governor of Ohio and the ODOH issued a series of orders that declared a state of emergency in Ohio, temporarily closed all barbershops, hair salons, nail salons, and tattoo parlors in Ohio, directed all Ohio citizens to remain at home, and ordered all non-essential businesses in Ohio to cease serving customers. *Id*. ¶¶ 50-60. The FAC references (¶¶ 57-59) three of these orders: (1) the Governor's Order of March 9 ("Order 1"); (2) the ODOH Order of March 19 closing hair salons and similar businesses ("Order 2"); and (3) the ODOH Order of March 22 ordering Ohio residents to shelter at home except to visit essential

businesses that were identified in the Order ("Order 3").[1]  As a result of Orders 2 and 3, Plaintiff was not allowed to operate its business and Plaintiff's customers were not permitted to leave their homes to visit Plaintiff's business.

Significantly, Order 2 was not limited to foreclosing Plaintiff from offering salon services at the insured premises.  Because the stated purpose of Order 2 was to "prevent[ ] the spread of contagious or infectious disease," affected businesses (including Plaintiff's) were prohibited from performing "services that may be delivered in the customer's home or in the home of the licensee."  Order 2 ¶ 6.  That is, Order 2 was not focused on any particular property.  It was designed to halt non-essential *services* that required close contact between employee and customer (*e.g.*, hair salons, tattoo parlors, massage parlors, etc.), *wherever* such services might be provided.

Order 3 was far broader.  It required all Ohioans to remain in their homes "except as allowed in this Order."  Order 3 ¶ 1.  All "non-essential" businesses—not just those covered in Order 2 where close contact between the employee and the consumer was necessary—were required to close.  *Id*. ¶ 2.  Order 3, however, permitted a huge number of businesses to stay open, including grocery stores, banks, hardware stores, laundromats, restaurants (for take-out or delivery), law and accounting firms, hotels, etc.  *Id*. ¶ 12.  Order 3 set forth rules for essential businesses that were allowed to reopen.  *Id*. ¶ 18.  Among other things, businesses were told to clean surfaces and to "[p]rovide disposable wipes so that commonly used surfaces can be wiped down by employees before each use."  *Id*. ¶ 18(f).  That is, many businesses were allowed to reopen *despite the fact* that the Coronavirus would be on the premises and that infected persons

---

[1]  These Orders are attached hereto at Exhibits 1-3.  Because these Orders are expressly referenced in the FAC and are a matter of public record, this Court may consider them on this motion.

would visit the store.  Order 3 was by its terms designed to impede the person-to-person spread of the virus by keeping Ohioans at home and limiting the places where they could gather.

Plaintiff admits that these Executive Orders prevented it from servicing clients.[2]  Plaintiff also admits that the Executive Orders, by restricting Plaintiff's business and requiring its customers to stay home, *caused* it to suffer significant business losses.  *Id.*, "Introduction," p. 2; ¶ 25 ("Plaintiff sustained, and continues to sustain, direct physical loss or damage … *due to the civil authority orders issued by the Governor of Ohio and the Ohio Department*"); ¶ 63 (Executive Orders "have required and continued to *require Plaintiff to cease and/or significantly reduce operations* at … the premises described in the Policy").[3]  Plaintiff submitted a claim to Erie, seeking coverage for its income losses and extra expenses resulting from closing its business.  *Id.* ¶ 80.  Erie denied this claim.  This litigation followed.

### THE POLICY[4]

The Policy expressly sets forth the basic "Insuring Agreement," which provides:

> **SECTION I – COVERAGES**
> **INSURING AGREEMENT**
>
> We will pay for ***direct physical "loss" of or damage to*** Covered Property at the premises described in the "Declarations" caused by or resulting from a peril insured against.

---

[2] *See* FAC ¶ 56 (Executive Orders "restrict[ed] business operations and access to property"); ¶ 59 ("the [ODOH] issued a Stay at Home Order effective March 23, 2020, ordering Ohio residents to stay at home" and "ordered all non-essential businesses in Ohio to cease all activities"); ¶ 62 ("The civil authority orders prohibited access to Plaintiff's premises described in the Policy").

[3] *See also* FAC ¶ 90(4) (common issue is "whether the losses incurred by insureds *as the result of the orders issued by* the Governor of Ohio and the [ODOH]"); ¶ 108(a) (seeking a declaration that "[t]he losses incurred by Plaintiff and the Class members *as a result of the orders* … are covered losses under the Policy"); ¶ 108(g) (seeking a declaration that there is "coverage for loss(es) *due to the actions of Ohio civil authorities*") (all *emphasis added*).

[4] Erie attaches hereto as Exhibit 4 a full copy of the Policy with Bates stamps ("EIE-Lock 0001-0102") for ease of citation.

(EIE-Lock 0010)   The Insuring Agreement, therefore, makes clear that direct physical loss of property or direct physical damage to property is a prerequisite to coverage under the Policy.   It also requires that such loss or damage have been caused by a "peril insured against," the meaning of which is defined in Section II of the Policy:

---

**SECTION II – PERILS INSURED AGAINST …**

**INCOME PROTECTION – COVERAGE 3**

**Covered Cause of Loss**

This policy insures against **_direct physical "loss",_** except "loss" as excluded or limited in this policy.

---

(EIE-Lock 0013 *emphasis added*)  The term "loss," in turn, "means *direct and accidental* loss of or damage to covered property."  (EIE-Lock 0045)  Thus, insured perils are limited to *direct and accidental physical* losses and damage.

The Policy affords Income Protection Coverage as follows:

---

**INCOME PROTECTION – COVERAGE 3**

**A.      Income Protection Coverage**

Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against.

---

(EIE-Lock 0012) The term "interruption of business" is defined as the period of time between the direct and accidental loss triggering coverage and "the date when the covered property should be *repaired, rebuilt, or replaced* with reasonable speed and similar quality."  (EIE-Lock 0045)

Thus, Income Protection Coverage expressly contemplates some form of direct and accidental physical loss or damage capable of being repaired, rebuilt, or replaced.

The Policy affords Extra Expense Coverage as follows:

---

**B.     Extra Expense Coverage**

"Extra expense" coverage is provided at the premises described in the "Declarations".

"Extra expense" means necessary expenses you incur due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against.

---

(EIE-Lock 0012)

The Policy affords Civil Authority Coverage as follows:

---

**C.     Additional Coverages**

**1.     Civil Authority**

When a peril insured against causes damage to property other than property at the premises described in the "Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" provided that both of the following apply:

a.     Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" are within that area but are not more than one mile from the damaged property; and

b.     The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property

---

(EIE-Lock 0013)

For all coverages under Coverage 3, the "Amount of Insurance" is limited to the time it would take to repair or replace damaged property:

> D.      **Amount of Insurance …**
>
> We will pay the actual income protection loss for … [t]he time period required to ***rebuild, repair or replace*** such part of the Building or Business Personal Property that has been ***damaged or destroyed*** as a direct result of an insured peril.

(EIE-Lock 0013 *emphasis added*)   This clause—commonly referred to as the "period of restoration" clause—expressly contemplates the direct and accidental physical damage or destruction of insured property that can be rebuilt, repaired or replaced.

## ARGUMENT

## I.      INTRODUCTION

Fed. R. Civ. P. 12(b)(6) requires dismissal of any complaint that fails to allege a plausible and legally cognizable claim.  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The factual allegations "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.*  Plaintiff falls far short of these elementary pleading standards.

Under Ohio law, the insured bears the burden of proving both a loss and that the insurance policy covers the loss.[5]  *See Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999); *Murray v. Auto-Owners Ins. Co.*, 40 N.E.3d 679, 685 (Ohio Ct. App. 2015).  Thus, establishing that an insured's loss falls within an insurance policy's affirmative coverages is a necessary element of any claim that the insurer failed in its obligations under the policy.  *See Murray*, 40 N.E.3d at 685.

---

[5] This Court should apply Ohio state law pursuant to Pennsylvania's choice-of-law rules, as Ohio's interests in the parties' dispute and the outcome thereof are the most substantial. *See Complaint of Bankers Trust Co.*, 752 F.2d 874, 881-82 (3d Cir. 1984), *citing Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805-06 (Pa. 1964).

## II. PLAINTIFF FAILS TO PLAUSIBLY ALLEGE ANY DIRECT AND ACCIDENTAL PHYSICAL LOSS OF OR DAMAGE TO PROPERTY

### A. Direct And Accidental Physical Damage to Property is Required to Trigger Coverage, And None Is Alleged In The FAC

Plaintiff's FAC fails to state a viable claim for Business Income or Extra Expense coverage because it contains no plausible allegation that the Coronavirus—or the Executive Orders designed to contain the virus—caused any physical damage to the Premises. Under the Policy's Insuring Agreement, Erie need only "pay for *direct physical 'loss' of or damage to* Covered Property at the premises described in the 'Declarations' caused by or resulting *from a peril insured against*." *See supra*, EIE-Lock 0010 (*emphasis added*). Under the Perils Clause, in turn, a "peril insured against" means "*direct physical 'loss'* unless the loss is excluded or limited." *Id*. (*emphasis added*). These policy definitions and terms emphasize a threshold requirement for direct and accidental *physical* damage to property at the insured premises. *Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014) ("the words 'direct' and 'physical,' which modify the phrase 'loss or damage,' ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure").[6] This is basic in insurance law. *See* 10A *Couch On Insurance* § 148.46 (3d Ed. 2019) ("[T]he requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude losses that are intangible or incorporeal, and, thereby to preclude any claim against the property insurer when the insured

---

[6] *See also SatisPie, LLC v. Travelers Prop. Cas. Co. of Am.*, No. 6:17-CV-06234 EAW, 2020 WL 1445874, at *3 (W.D.N.Y. Mar. 25, 2020) ("the phrase 'risks of direct physical loss' has been interpreted to mean 'some form of actual, physical damage' to the insured property"); *Roundabout Theatre Co., Inc. v. Cont'l Cas. Co.*, 302 A.D.2d 1, 6 (N.Y. App. Div. 2002) (policy's requirement of direct physical loss or damage to property limited coverage to those "losses involving physical damage to the insured's property").

merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.").

This interpretation of the Policy is reinforced by the "period of restoration" clause, which makes clear that business interruption coverage "[e]nds on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality." *See supra,* EIE-Lock 0045. The terms "repair," "rebuild," and "replace" makes clear that the damage contemplated by the insuring agreement is *physical* in nature. *Philadelphia Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280 (S.D.N.Y. 2005), is directly on point. There, the insured's parking garage at Philadelphia International Airport lost significant revenue when the federal government grounded all air traffic in response to the 9/11 attacks, thus decreasing traffic to the parking garage. *Id*. The district court held that the policy's business interruption coverage, which required "direct physical loss or damage," did not cover the insured's loss because the parking garage did not suffer direct physical loss or damage. *Id*. at 282, 286-87. As the district court noted, the insured's claim was for economic losses untethered to any physical damage. *Id*. at 287-88. Such a claim is not covered by business-interruption coverage requiring "direct physical loss or damage." *Id*.

In reaching this result, the court emphasized that the period of restoration clause would make no sense if physical damage was not required. *Id*. at 287. *See also Newman Myers*, 17 F. Supp. 3d at 332 ("The words 'repair' and 'replace' contemplate physical damage to the insured premises *as opposed to loss of use of it*") (*emphasis added*); *Roundabout Theatre*, 302 A.D.2d at 8 (period of restoration clause would be rendered meaningless if there was coverage absent physical damage). As set forth below, numerous courts have relied on the period of restoration clause in dismissing identical claims, reasoning that the clauses would be impermissibly

rendered meaningless if coverage was based on a condition (a virus) causing no physical property damage, let alone damage that could not be repaired, replaced, or rebuilt.

Plaintiff fails to plead any facts describing any direct physical loss or damage to its property and hence the FAC fails to state a claim.  As the FAC concedes, Plaintiff seeks coverage because the Executive Orders, that are hardly "accidental" and did not cause any property damage, (i) enjoined Plaintiff from serving its customers at any location (including in the customer's home), and (ii) enjoined its customers from utilizing Plaintiff's services at any location (including the homes of Plaintiff's employees).  As a factual and legal matter, it is undeniably the case—as the FAC admits—that what caused Plaintiff's loss were acts and decisions of government officials under law labeling hair salons as non-essential businesses.  As case-after-case has held, as explained *infra* § II.D, there is no coverage under these circumstances.

**B.     The FAC Fails To State A Claim Because A Virus Does Not Cause Property Damage**

Putting aside, for the moment, that Plaintiff is *not* seeking damages resulting from any physical damage to its property, but is instead seeking damages flowing from the Executive Orders closing its business and enjoining its customers from utilizing Plaintiff's services, a virus does not damage property and hence allegations of a virus on property would not be sufficient to trigger coverage.  *Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App. 3d 23 (Ohio Ct. App. 2008) is instructive.  In *Mastellone*, the insureds sought coverage under its insurance policy for, among other things, mold staining the exterior of their residence.  *See id*.  The *Mastellone* policy's "Perils Insured Against" clause provided that the policy protected against loss to property "only if that loss is a physical loss to property."  *Id*. at 40-42.  The Ohio Court of Appeals held that the mold staining on the exterior of the insured residence did not qualify as a

physical injury for which the policy afforded coverage.  *Id.* at 41-42.  It premised this conclusion on the fact that the mold staining was "only temporary and did not affect the structure of the wood."  The same is true of a virus.

*Mastellone* is in accord with other courts holding an insurance policy's requirement of direct physical loss or damage requires *actual physical damage* to property, *i.e.*, damage that is tangible, and that cannot – unlike microbial matter – be simply washed away.  *See, e.g.*, *Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569 (6th Cir. 2012) (requirement of "direct physical loss or damage" not met where presence of bacteria in air conditioning system did not cause tangible damage to insured premises"); *Columbiaknit, Inc. v. Affiliated FM Ins. Co.*, 1999 WL 619100, at *7 (D. Or. 1999) (exposure of clothing to elevated spore counts was not "physical loss" in the absence of a "distinct and demonstrable physical change to the garment necessitating some remedial action").

Here, Plaintiff provides only threadbare, speculative, and conclusory allegations that the Coronavirus was on its premises.  Even if those allegations are credited, they are irrelevant under *Mastellone* and other cases.  Any contamination of property by the Coronavirus can be easily remedied by cleaning and sanitizing the subject property.  According to the Centers for Disease Control and Prevention, the Coronavirus can be wiped off of surfaces by simple cleaning using widely available products from any local gas station, CVS, Target, or Walmart.[7]  Similarly,

---

[7]  *See*  https://www.cdc.gov/coronavirus/2019-ncov/community/reopen-guidance.html  (stating that one can simply wipe a surface down with "1/3 cup of bleach added to 1 gallon of water) (last accessed 9/17/2020).  This Court may take judicial notice of CDC guidelines without converting this Motion to Dismiss to a Motion for Summary Judgment.  *See Carmen R. v. Decker*, 2020 WL 2029337, at *10 (D.N.J. 2020); *Black v. Columbus Pub. Sch.*, 2007 WL 2713873 (S.D. Ohio 2007).

Order 3 instructed essential businesses that remained open to simply clean surfaces with common cleaning products. Thus, like the mold staining in *Mastellone*, and the bacteria contamination in *Universal Image Prods., Inc.*, any purported contamination of Plaintiff's premises did not cause physical loss of or damage to its property. *See also Mama Jo's Inc. v. Sparta Ins. Co.*, __ F. App'x. __, 2020 WL 4782369 (11th Cir. Aug. 18, 2020) (holding that a structure does not suffer direct physical loss where it merely needs to be cleaned—in that case, construction dust).

Importantly, this Court can take notice of the fact that many businesses deemed "essential" were allowed under Order 3 to stay open and did so, thus belying any argument that the Coronavirus caused direct and accidental physical damage to property or made property uninhabitable or unusable. Indeed, many businesses that were once required to be closed under various state orders have since been permitted to reopen—*despite the continued community spread of COVID-19*. If all properties exposed to the virus were physically "damaged" so that they were no longer usable, then all businesses—and all homes for that matter where someone tested positive—would have been shuttered and would remain shuttered now. But that is not what happened, because the Coronavirus does not damage property; it infects and harms people.

The Southern District of New York, in *Social Life Magazine, Inc. v. Sentinel Ins. Co.*, Case No. 1:20-cv-03311-VEC (S.D.N.Y. 2020) (Ex. 4), was the first court to conclude that a business interruption caused by the outbreak of the Coronavirus and related closure orders did not meet the business-interruption coverage's requirement of direct physical loss of or damage to property, *i.e.*, direct physical loss of or damage to property. In denying the insured's motion for a preliminary injunction, the district court in *Social Life Magazine* observed:

THE COURT:          What is the damage?  There is no damage to your property.

| MR. FISCHBARG: | Well, the virus exists everywhere. |
|---|---|
| THE COURT: | It damages lungs.  It doesn't damage printing presses. |

***

| MR. FISCHBARG: | Mold spores, bacteria, virus, all those are physical items which damage whatever they are on, whatever they land on.  And in this case, the virus, when it lands on something and you touch it, you could die from it.  So – |
|---|---|
| THE COURT: | That damages you.  It doesn't damage property. |

*Id.* at 4-8.[8]  This reasoning has guided numerous courts in concluding that there is no business interruption coverage, as explained below.

### C.   The FAC Fails To State A Claim Because Plaintiff Admits That Its Loss Was *Caused* By The Executive Orders

Plaintiff is bound by its own numerous pleaded admissions that it was the *Executive Orders*—not any damage to its property—that "resulted in losses to [its] business." FAC, "Introduction" at p. 2.[9]  Notably, Plaintiff seeks a declaration that "[t]he losses incurred by Plaintiff and the Class members *as a result of the orders* … are covered losses under the Policy.[10]  These admissions doom Plaintiff's claim, because under the Policy, coverage exists only where the loss "*results directly from*" or is "*caused by*" a peril insured against.  This is clear

---

[8] Plaintiff withdrew its Complaint before the court could issue its written opinion.

[9] *See also*, FAC ¶ 25 ("Plaintiff sustained, and continues to sustain, direct physical loss or damage … *due to the civil authority orders issued by the Governor of Ohio and the Ohio Department*"); ¶ 63 (Executive Orders "have required and continued to *require Plaintiff to cease and/or significantly reduce operations* at … the premises described in the Policy") (all emphasis added).

[10] FAC ¶ 108(a); *see also id.* ¶ 108(g) (seeking a declaration that there is "coverage for loss(es) *due to the actions of Ohio civil authorities*").

in the "Insuring Agreement"[11] as well as the "Income Protection Coverage" in "Coverage 3."[12] *Supra*, at EIE-Lock 0010 and EIE-Lock 0012.  Because Plaintiff admitted its losses were caused by the Executive Orders, and not any damage to its property, Plaintiff has pleaded itself out of coverage.

Plaintiff amended its Complaint for the express purpose of including allegations that the virus was on its property.  Plaintiff failed to achieve that, as its threadbare conclusions do not plead any *facts* like *when* the virus was allegedly on the property, *who* had the virus, *what part* of the property, and *how long* the virus stayed there.  Plaintiff also offers no clue as to why, if Plaintiff now suddenly believes there was virus on its property, it did not remediate the virus by removing it as the Policy would have *required* Plaintiff to do.[13]  Regardless, it does not matter whether the virus was on Plaintiff's property because, *as Plaintiff admits*, even if it was, it was not the *cause* of its loss; the Executive Orders were. As courts have already held (see below), government restrictions on businesses during the pandemic do *not* trigger coverage.

Causation is critical, and not just under the plain terms of the Policy.  A complaint must set forth plausible allegations as to the *cause* of the loss.[14]  Plaintiff's FAC does not set forth *any* causal connection, let alone a plausible one, between any possible virus on its premises and its

---

[11] "We will pay for direct physical 'loss' of or damage to Covered Property at the premises described in the 'Declarations' *caused by or resulting from a peril insured against*." (*emphasis added*).

[12] "Income Protection means loss of 'income' … you sustain due to partial or total 'interruption of business' *resulting directly from* 'loss' or damage to property on the premises described in the 'Declarations' from a peril insured against." (*emphasis added*).

[13] The Policy is clear that in the event of business interruption, it would be required to "make necessary replacements or repairs and use all available means to eliminate any unnecessary delay in order to resume operations as soon as possible."  EIE-Lock 0044 at "i".

[14] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557-558 (2007) ("something beyond the mere possibility of loss causation must be  alleged");  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (While Rule 8 is "not meant to impose a great burden" a plaintiff must plead the requisite "casual connection").

purported loss; Plaintiff squarely blames that loss *on the Executive Orders*.  In Order 2, the *State of Ohio closed Plaintiff's business and ordered all Ohioans not to get hair salon services anywhere*.  The cause of Plaintiff's alleged losses, therefore, and obviously, is Order 2, not any possible virus that may or may not have been on the premises.

Tellingly, Plaintiff does not allege that it discovered Coronavirus on its premises *before* Order 2 was issued[15] and that, as a result of concluding that its property was damaged, it closed its business.  To the contrary, according to the FAC, Plaintiff was *forced by Order 2* to close its business.  Plaintiff's losses were directly caused by the Executive Orders, as it concedes.

### D.    Courts Across The Country Have Dismissed Identical Claims

For these precise reasons, courts across the country have dismissed policyholder complaints seeking business interruption coverage against insurance companies where, as here, the insured alleged that it lost business as a result of governmental edicts shutting down or limiting the insured's business.  *See, e.g., Sandy Point Dental v. Cincinnati Ins. Co.,* 2020 WL 5630465 (N.D. Ill. Sept. 9, 2020); *Pappy's Barber Shops, Inc., et al v. Farmers Grp., Inc., et al.*, 2020 WL 5500221 (S.D. Cal. Sept. 11, 2020); *10E, LLC v. Travelers Indem. Co. of Connecticut, et al.*, 2020 WL 5359653 (C.D. Cal. Sept. 2, 2020); *Malaube, LLC v. Greenwich Ins. Co.*, 2020 WL 5051581 (S.D. Fla. Aug. 8, 2020); *Diesel Barbershop, LLC v. State Farm Lloyds*, __ F.Supp.3d __, 2020 WL 4724305 (W.D. Tex. Aug. 13, 2020); *Rose's 1, LLC, et al. v. Erie Ins. Exch.*, 2020 WL 4589206 (D.C. Super. Ct. Aug. 6, 2020); *Plan Check Downtown III, LLC v. AmGuard Ins. Co.*, No. CV 20-6954-GW-SKx, 2020 WL 5742712 (C.D. Cal. Sept. 10, 2020); *Infinity Exhs. Inc. v. Certain Underwriters at Lloyds*, Case. No. 8:20-cv-1605-T-30AEP (M.D.

---

[15] In fact, Plaintiff does not allege that it *ever* discovered the virus on its property.  Plaintiff only speculates that the virus was there.  Even now, after amendment, Plaintiff must concede that it does not know if the virus was "*on*" its property "*and/or around*" its property.  FAC ¶ 23 (*emphasis added*).

Fla. Sept. 29, 2020); (Ex. 6); *Gavrilides Mgmt. Co. v. Michigan Ins. Co.*, Case No. 20-258-CB (Mich. Cir. Ct. July 1, 2020) (Ex. 7); *Oral Surgeons, P.C. v. The Cincinnati Ins. Co.*, No. 4-20-CV-222-CRW-SBJ (S.D. Iowa September 9, 2020) (Ex. 8).   Like Plaintiff, each of the insureds in these cases alleged that executive orders in their respective jurisdictions caused their business interruption losses.  Courts dismissed the insureds' claims every time.

In *Malaube*, for example, the court held that the policy required some form of tangible physical damage to trigger coverage; the executive orders were not sufficient.  *Malaube, LLC,* 2020 WL 5051581, at *5-6.  In reaching this result, the court noted that the period of restoration clause strongly supported this interpretation, as the words "repair" and "replace" would be meaningless in the absence of physical damage.  *Id.* at *9.  Similarly, in *Mudpie, Inc. v. Travelers Ins. Co of America*, -- F.Supp.--, 2020 WL 5525171, *4 (N.D. Cal. Sept. 14, 2020), the court dismissed a policyholder's COVID-19 business interruption claim in part on the basis of the period of restoration clause:  "The words 'rebuild,' 'repair' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature … But here, there is nothing to fix, replace or even disinfect for Mudpie to regain occupancy of its property") (internal quotations omitted).

*Pappy's Barber Shops* held that a barbershop's closure in response to executive orders did not trigger coverage under the barbershop's insurance policy.  Like Plaintiff's Policy, the policy there required, among other things, "direct physical loss of or damage to property at the [insured] premises."  *Pappy's*, 2020 WL 5500221, at *6-9.  The district court held that the barbershop failed to plausibly plead coverage due to the closure orders, as the closure orders themselves did not cause direct physical loss of or damage to property on the insured premises.

*Id*. at *6-10.   The court noted: "[m]ost courts have rejected these claims, finding that the government orders did not constitute direct physical loss or damage to property." *Id*. at *4.

The policy in *Infinity Exhs*. contained the identical clause found in Plaintiff's policy: "We will pay for direct physical loss of or damage to Covered Property …" *See* Ex. 6 at 2.  Just like here, the insured did not describe how its property was damaged or how such damage caused the insured to suffer a loss. The court dismissed the complaint because it failed to allege an "an actual, concrete damage" that was both "'direct' and 'physical'" and caused a loss. *Id*. at 7.

*Sandy Point Dental* is also directly on point.  There, the court held that the phrase "direct physical loss"—the same exact phrase used in Sections I and II of the Policy—required "some form of actual, physical damage to the insured premises to trigger coverage."  *Sandy Point Dental*, 2020 WL 5630465 ,at  *2.   The court held that "the coronavirus does not cause direct physical loss" (citation omitted) and that, "[i]n essence, plaintiff seeks insurance coverage for financial losses as result of the closure orders."  *Id*. at *2-3.  The same is true here.   *See also Oral Surgeons, supra*, Ex. 8 at 2 (the insured "contends its loss was caused by the COVID-19 coronavirus and the governmental actions to suspend [business] … Recent cases cited by [the insurer] have held that virus-related closures of business do not amount to direct loss to property … [t]he few contrary cases cited by [plaintiff] are … not as well analyzed as the many authorities cited by [the insurer]").

*10E, LLC* held that "losses from inability to use property do not amount to 'direct physical loss of or damage to property' within the ordinary and popular meaning of that phrase." *10E LLC*, 2020 WL 5359653, at *4.  The district court held that direct physical loss or damage occurs only when property suffers a "distinct, demonstrable, physical alteration," and that this requirement is not satisfied by "detrimental economic impact" and cannot be avoided by

pleading "temporary impairment to economically valuable use of property as physical loss or damage." *Id*. at \*4-5.

The insureds in *Diesel Barbershop* likewise alleged that they suffered business interruption losses as the result of several executive actions taken in Texas in response to the outbreak of the Coronavirus. *Diesel Barbershop*, 2020 WL 4724305, at \*1-3. The district court held that their insurance policies' requirement of "direct physical loss" required tangible injury to property, *i.e.*, a "distinct, demonstrable physical alteration of the property," in order to trigger their business-interruption coverage. *Id*. at \*4-5. The Texas orders did not cause such tangible injury to property, and, as such, the district court held that the insureds failed to plead the direct physical loss necessary to trigger the insurance policies' business interruption coverage. *Id*.

*Rose's 1* involved a practically identical complaint by insureds *against Erie*, and called upon the court to interpret a policy that had the same basic insuring agreement/perils language in this case. *See Rose's 1, LLC*, 2020 WL 4589206 (D.C. Super. Aug. 6, 2020). The court relied upon numerous cases nationwide in concluding that "courts have rejected coverage when a business's closure was not due to direct physical harm to the insured premises." *Id*. at \*9. The loss of use occasioned by a government edict, standing alone, does not qualify as the direct physical loss necessary to trigger a policy's business-interruption coverage. *See id*. at \*6-14.[16]

---

[16] The Circuit Court of Michigan in *Gavrilides* held that the outbreak of the Coronavirus and responsive closure orders did not cause the direct physical loss of or damage to property necessary to trigger business-interruption coverage. The insured argued that it had suffered physical loss because the closure orders prohibited it from operating its business, but the court dismissed this as "simply nonsense" because "it [came] nowhere close to meeting the requirement that ... there has to be some physical alteration to or physical damage or tangible damage to the integrity of the building." *Id*. at 20:14-18. Rather, the policy's requirement of "direct physical loss of or damage to property" required "something with material existence. Something that is tangible. Something ... that alters the physical integrity of the property." *Id*. at 19.

As noted by the court in *Plan Check Downtown*, governmental closure orders are conceptually no different than myriad laws and regulations governing how, when, and where businesses (there, a restaurant) must operate, and that permitting a business interruption claim to be based on the enforcement of governmental regulations would result in a "sweeping expansion of insurance coverage without any manageable bounds." *Plan Check Downtown III, LLC*, 2020 WL 5742712, at *6. The court explained that the insured's argument, if accepted:

> would mean that potentially any regulation that limits a business's operations would trigger coverage. For example, consider the following scenarios: (1) a city changes its maximum occupancy codes to lower the caps, meaning that a particular restaurant can no longer seat as many customers as it used to; (2) a city amends an ordinance requiring restaurants located in residential zones to cease operations … [for longer periods]; (3) a city issues a mandatory evacuation order to all of its residents due to nearby wildfires … Under [the insured's] standard, all these instances would trigger insurance coverage. While [the insured] may believe that that is an appropriate result, the Court is not persuaded …

*Id*. at *7-8.

The logic of the court's argument is compelling. State, county, and local governments routinely enact laws and issue regulations that regulate business. The Executive Orders here are just that. If the impact of governmental edicts were sufficient to trigger coverage, then the policies would be fundamentally transformed, from insurance covering business losses flowing from direct and accidental physical damage, into "regulation insurance" that would ensure profits in the face of the purposeful exercise of governmental power to regulate business. The policies do not provide such coverage, and were not intended to.

As set forth above, courts have repeatedly held in these COVID-19 business interruption cases that executive orders shuttering businesses are insufficient to trigger coverage. Here, Plaintiff contends that it suffered losses due to the Executive Orders, and, just like in all the above cases, that is simply insufficient to trigger coverage.

20

### III.   PLAINTIFF FAILS TO PLAUSIBLY ALLEGE THAT ITS LOSSES ARE COVERED UNDER THE POLICY'S CIVIL AUTHORITY COVERAGE

Plaintiff fails to state a claim for coverage under the Policy's Civil Authority coverage. That coverage unambiguously requires that:

1.     A peril insured against caused direct physical loss of or damage to property *other than* property on the Premises;

2.     A civil authority took action to prohibit access to the area *immediately surrounding the damaged property* as a result of the damage;

3.     The civil authority's action was taken in response to *dangerous physical conditions resulting from the damaged property* or the continuation of the peril insured against that caused the damage, or the action was taken to enable a civil authority *unimpeded access to the damaged property*;

4.     The Premises is within the area to which the civil authority prohibited access, and is located *not more than one mile from the damaged property*; and

5.     Plaintiff suffered a loss of income, rental income, or extra expenses *caused by the action of a civil authority that prohibited access to the Premises*.

EIE-Lock 0013.  Plaintiff fails to plead *any* of these elements.  Nor could it.  Civil authority coverage is meant to apply in situations where, for example, there is a fire, crane collapse, or some other serious incident causing the government to close off streets to enable others (like first responders, investigators or construction crews) to have access to the damaged site.  It has no application to a pandemic, during which the government issues orders in an effort to stop the community spread of a virus.  Significantly, in each of the above COVID-19 business interruption cases, the Court dismissed the throw-away civil authority claim that Plaintiff asserts here.

In any event, the claims fail here.  *First*, the FAC does not allege direct physical loss of or damage to property *other than Plaintiff's property*.  *Second*, there are no facts pleaded that any civil authority took action to prohibit access to the area immediately surrounding the damaged property as a result of damage to such surrounding property.  *Third*, there is no allegation that Plaintiff was denied access to its property so that a civil authority could access the nearby damaged property.  *Fourth*, Plaintiff did not suffer damages because the ODOH prohibited Plaintiff from accessing its premises due to some "dangerous physical condition" at a nearby property.  Plaintiff has pleaded *none* of these elements.

Moreover, the Executive Orders did not prohibit *all* access to the Premises, as is required to trigger Civil Authority Coverage.  *See 54th Street Ltd. Partners, L.P. v. Fidelity & Guar. Ins. Co.*, 306 A.D.2d 67 (N.Y. App. Div. 2003).[17]  Namely, the ODOH's Stay-At-Home-Order permitted even non-essential businesses to continue operations defined as "Minimum Basic Operations."  *See* Order 3 at 1.[18]  Access to the Premises was, therefore, not totally prohibited as is required by the Civil Authority Coverage, but, to the contrary, was expressly permitted.

---

[17] *See also S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1140-41 (10th Cir. 2004) (holding no civil authority coverage existed where the civil authority did not prohibit access to hotel operations); *730 Bienville Partners Ltd. v. Assurance Co. of Am.*, 67 F. App'x. 248 *2-3 (5th Cir. 2003) (holding FAA's grounding of all civilian aircraft in response to the 9/11 attacks did not prohibit access to hotels even though it may have reduced hotel capacity because it was not impossible for hotel guests to get to the hotel); *Schultz Furriers, Inc. v. Travelers Cas. Ins. Co. of Am.*, 2017 WL 1731005, at *4 (N.J. Super. Ct. 2007) (concluding that no civil authority coverage existed where access to the store was not "totally and completely prevented, *i.e.*, made impossible"); *Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, LLP v. Nat'l Fire Ins. Co.*, 2007 WL 2489711, at *6 (M.D. La. 2007) (concluding that no civil authority coverage existed where advisories did not prohibit access to insured premises); *Penton Media, Inc. v. Affiliated FM Ins. Co.*, 2005 WL 8171363, at *9 (N.D. Ohio 2005), *aff'd*, 245 F. App'x. 495 (6th Cir. 2007); *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 289-90.

[18] The Order's definition of "Minimum Basic Operations" allowed access to the Premises for purposes such as maintaining the value of Plaintiff's inventory, preserving the Premises and Plaintiff's equipment, and processing payroll.  *Id*. at 7.

Moreover, a causal connection must exist between the alleged property damage and the civil authority's action, *i.e.*, the civil authority must have acted in response to property damage. This causal connection is not satisfied where the civil authority acts not in response to property damage, but merely to prevent some *future* loss or harm. *See United Airlines, Inc. v. Ins. Co.*, 385 F. Supp. 2d 343, 353 (S.D.N.Y. 2005), *aff'd*, 439 F.3d 128 (2d Cir. 2006) (civil authority coverage did not exist where the decision to halt operations at Ronald Reagan Washington National Airport in response to the 9/11 attacks was a response to fears of future attacks, and not damage to insured property); *Cleland Simpson Co. v. Firemen's Ins. Co. of Newark*, 140 A.2d 41 (Pa. 1958) (no civil authority coverage where the Mayor of Scranton declared a state of emergency and shut down businesses to avoid a fire after a storm cut off the city's water supply, because businesses were closed due to the fear of damage, not actual damage).[19]   Here, the Executive Orders were, on their face, issued for the purposes of preventing the future spread of the Coronavirus among people, and not in response to any property damage.[20]   Because the Ohio orders were not responsive to any property damage, they do not trigger the Policy's Civil Authority Coverage.

---

[19] *See also Dickie Brennan & Co., Inc. v. Lexington Ins. Co.*, 636 F.3d 683, 686 (5th Cir. 2011) (holding civil authority coverage must arise from a civil order "issued as a direct result of physical damage" to other property, and that civil authority coverage, therefore, did not exist where a business was closed due to a hurricane evacuation order); *Syufy Enters. v. Home Ins. Co. of Ind.*, 1995 WL 129229, at *2 (N.D. Cal. Mar. 21, 1995) (holding no civil authority coverage existed for business closure due to a city-wide curfew to prevent looting and rioting); *Kelaher Connell & Connor, P.C. v. Auto-Owners Ins. Co.*, 2020 WL 886120, at *7 (D. S.C. Feb. 24, 2020); *Bros., Inc. v. Liberty Mut. Fire Ins. Co.*, 268 A.2d 611 (D.C. Ct. App. 1970) (court interpreted the "direct loss" requirement to mean there had to be "loss proximately resulting from physical damage to the property or contents caused by a riot or civil commotion").

[20] Orders 2 and 3 were issued pursuant to its authority under R.C. § 3701.13 to "make special orders … for preventing the spread of contagious or infectious diseases."  *See* Ex.2 at 1; Ex. 3 at 1.  Both orders also explicitly state that they were issued "to avoid an imminent threat with a high probability of widespread exposure to COVID-19 with a significant risk of substantial harm to a large number of people in the general population, including the elderly and people with weakened immune systems and chronic medical conditions …."  *See* Ex. 2 at 4; Ex. 3 at 12.

## CONCLUSION

For the foregoing reasons, this Court should, therefore, dismiss the First Amended Complaint in its entirety.

Respectfully submitted,

DiBELLA, GEER, McALLISTER & BEST, P.C.

By: _/s/ Paul K. Geer_
    Paul K. Geer, Esquire
    Pa. I.D. No. 27675

By: _/s/ Tara L. Maczuzak_
    Tara L. Maczuzak, Esquire
    Pa. I.D. No. 86709

By: _/s/ Jason H. Peck_
    Jason H. Peck, Esquire
    Pa. I.D. No. 308111

    DiBella Geer McAllister Best, PC
    20 Stanwix Street
    11th Floor
    Pittsburgh, PA 15222

    412.261.2900-Telephone
    412.261.3222-Facsimile

    ALSTON & BIRD, LLP

By: _/s/ Adam J. Kaiser_
    Adam J. Kaiser, Esquire
    *Pro Hac Vice*

By: _/s/ Tiffany L. Powers_
    Tiffany L. Powers, Esquire
    *Pro Hac Vice*

Alston & Bird, LLP
90 Park Avenue
New York, NY 10016

212.210.9465-Telephone